

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00519-CR

Earl James **OTTER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2017CR3776
Honorable Laura Lee Parker, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice
Concurring Opinion by: Patricia O. Alvarez Justice

Sitting:       Rebeca C. Martinez, Justice
               Patricia O. Alvarez, Justice
               Liza A. Rodriguez, Justice

Delivered and Filed: July 10, 2019

AFFIRMED

A jury convicted Appellant Earl James Otter of manslaughter for the death of Abigail

Winters. The sole issue presented on appeal is whether the trial court erred in denying Otter's pre-

trial motion to suppress. We affirm the trial court's judgment.

## BACKGROUND

On May 18, 2016, an emergency dispatch operator received a frantic call from a male, later

identified as Otter, who stated he believed his girlfriend, Winters, had shot herself and was

nonresponsive. Live Oak Police Officer David Wall arrived first on the scene. His police body

camera captured video and audio that day. Upon arrival, Officer Wall rushed into a single-story house and proceeded to a back bedroom. There he saw Otter straddling Winters. Winters was bleeding from the neck. Officer Wall asked Otter: "Where's the weapon?" Otter pointed to a dresser and stated: "Right there on the top." Officer Wall asked Otter: "Did you come home and find her this way? So what happened?" Otter stated that he found hypodermic needles and confronted Winters about them. He said that Winters "got crazy" and then he told her: "Here, you can have my gun if that will make you feel better." Otter mentioned his daughter. Officer Wall interrupted Otter to ask for her whereabouts. Otter then asked if Winters was alive. Officer Wall checked Winters's pulse to confirm she was deceased. Otter then stated unprompted: "I don't know—I don't know if it happened—I was going to check my daughter and I heard . . . ." Otter trailed off.

Officer Wall left the bedroom and met Live Oak Police Sergeant John Alonzo in the hallway. Their meeting occurred approximately three minutes after Officer Wall arrived on the scene. Officer Wall returned to the bedroom, asked Otter to step away from Winters, and directed Otter to go with Sergeant Alonzo. Officer Wall studied the gun and magazines on the dresser. Officer Wall found magazines for a 9-millimeter gun and a 45-millimeter gun. He could not locate a 9-millimeter gun, so he began a search for one.

Sergeant Alonzo also wore a body camera. He led Otter outside. Sergeant Alonzo asked Otter who the victim was, and Otter responded that Winters was his girlfriend. Sergeant Alonzo asked for Otter's identification, Otter complied, and Otter then identified the house as his residence. Sergeant Alonzo stated, "So," but before he could continue, Otter provided a narrative. Otter stated that Winters had been gone all day. When she returned, Otter went to her room and discovered a purse full of hypodermic needles. Sergeant Alonzo asked what weapon was in the room. Otter responded that there were two weapons: a 9-millimeter gun and a 45-millimeter gun.

Otter continued his narrative. He stated that he and Winters struggled all through the house. Sergeant Alonzo asked: "So you were in there when she shot herself?" Otter responded "I think— I don't know. She came at me. I turned around, and I just pushed her back. I didn't know if she had a gun in her hand."

Sergeant Alonzo directed Otter to sit down. Otter continued his narrative. He explained that he gave Winters a gun. She was very upset. Otter heard his daughter crying and went to look for her. Otter heard Winters coming, turned around, and pushed her away. Otter then explained that he turned around to his daughter, and he remembered a gunshot. Sergeant Alonzo asked: "But you weren't in the room?" Before Otter answered, Sergeant Alonzo directed Otter to stand up and comply with a pat down for weapons. Next, Otter sought to return inside for a cigarette, but Sergeant Alonzo refused Otter entrance to the house and asked Otter to sit.

Otter then resumed his narrative. He stated that he and Winters struggled and that he wanted his gun returned to him. Sergeant Alonzo asked which gun, and Otter described a 45-millimeter gun. Otter then continued his narrative unprompted: "Anyhow, I went and saw what was wrong with my daughter. Told her to go in her room. Mommy and Daddy are talking. I go back there. I just thought she was lying there. And then I saw closer and I saw the blood." Sergeant Alonzo asked again where Otter was when Winters was shot. Otter answered: "Going to see my daughter down the hallway." Sergeant Alonzo asked for clarification, and Otter specified half-way down the hallway. Otter continued. He heard a shot and wondered whether Winters dropped the gun or shot him. Sergeant Alonzo sought clarification that Otter was in the hallway and that his daughter was in her bedroom. Otter clarified that both he and his daughter were in the hallway. Otter explained that he heard the gunshot, went into the back bedroom, applied pressure to Winters's neck, and called emergency dispatch. Sergeant Alonzo then asked for Otter's social security number and details about Otter's residence in the home.

At this point, approximately ten minutes into the recording from Sergeant Alonzo's body camera and approximately thirteen minutes after Officer Wall first arrived on the scene, Officer Wall came outside and asked Otter if he knew where the 9-millimeter gun was that would fit the magazine Officer Wall found on the dresser. Otter answered that he had placed both the 45-millimeter and 9-millimeter guns on the dresser in the back bedroom. Officer Wall went back into the house. Sergeant Alonzo then asked Otter for his telephone number, which Otter provided, and the full name and date of birth of Winters, which Otter also provided.

Sergeant Alonzo next stated that the police needed Otter's cooperation. Otter responded: "Yeah, I'll talk to a lawyer now." This occurred at approximately twelve minutes into the recording on Sergeant Alonzo's body camera. Approximately a minute later, Officer Wall came back outside and stated that he could not find the 9-millimter gun. Officer Wall patted Otter down and asked whether Otter knew where the gun was. Otter stated again that he thought he had put the gun on the dresser. Officer Wall reentered the residence.

Sergeant Alonzo resumed questioning Otter about where he was when the gun went off, but Otter waived him off and said: "I'm not talking to you anymore until I have a lawyer." Sergeant Alonzo stopped questioning. Otter asked a neighbor to bring a cigarette over, but Sergeant Alonzo told Otter that no one other than peace officers were allowed on the scene. Otter asked: "Am I under arrest?" Sergeant Alonzo responded: "No." He told Otter that he was "detained" and told Otter to cooperate. Sergeant Alonzo said that Otter could sit in front of the house, and if Otter chose not to, Sergeant Alonzo could put Otter in handcuffs and into the back of a patrol vehicle.

Sergeant Alonzo continued to detain Otter outside the home for approximately forty more minutes. At the motion to suppress hearing, Sergeant Alonzo testified that Otter was not free to leave. During this time, Otter volunteered information and Sergeant Alonzo questioned Otter for details about the shooting. Otter reiterated his earlier statements that he was in the hallway at the

time of the shooting. Approximately an hour after Sergeant Alonzo arrived on the scene, he transported Otter to the police station. Later that evening, the police found a 9-millimeter gun underneath Winters.

At the station, Texas Ranger Keith Pauska interviewed Otter. Early in the interview, Otter asked for an attorney, but then continued talking. Later, Otter declined to speak and asked to leave, and Ranger Pauska placed Otter under arrest.

Before trial, Otter moved to suppress statements he made in the recordings captured on the body cameras of Sergeant Alonzo and Ranger Pauska. Otter argued that he was in police custody at the time he made his statements and police questioning violated his constitutional *Miranda*[1] rights against self-incrimination. The trial court verbally denied Otter's motion to suppress as to his statements made at the scene, and found the statements admissible because Otter was temporarily detained for an investigation regarding a suicide as well as for safety concerns arising from the missing gun. The trial court granted in part and denied in part Otter's motion as to his statements made at the police station.

At trial, the State relied on Otter's statements made at the scene, but not his statements made at the police station. Officer Wall testified to his conduct at the scene, and the trial court admitted the recording from Officer Wall's body camera into evidence without objection. Sergeant Alonzo also testified, and the trial court admitted the recording from Sergeant Alonzo's body camera into evidence over defense counsel's objection.

Later at trial, Otter's friend Michael Arkwright testified that, a day or two after Winters died, Otter called Arkwright's girlfriend and stated, "I shot and killed her." Arkwright further

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

testified that, the next day, Arkwright and his girlfriend met with Otter, who stated that he had shot Winters in self-defense after a struggle over a gun.

Live Oak Police Sergeant Kevin McGuire testified that, two days after the shooting, he received a call from Otter. Otter stated in the call that he believed the gun went off during a struggle and, in his mind, it was a case of self-defense.

On appeal, Otter challenges the trial court's denial of his motion to suppress.

## WAIVER

Otter made statements on three body cameras: Officer Wall's body camera, Sergeant Alonzo's body camera, and Ranger Pauska's body camera. At the pre-trial hearing, Otter complained about the admission of his statements recorded on Sergeant Alonzo's body camera and Ranger Pauska's body camera,[2] but not his statements recorded on Officer Wall's body camera. The trial court verbally denied the motion to suppress as to Otter's statements made to Sergeant Alonzo, but granted the motion as to some statements Otter made to Ranger Pauska at the police station. We determine that Otter waived any appellate complaint about the admission of his statements recorded on Officer Wall's body camera.

On appeal, Otter does not clearly identify which recordings he references in his appellate arguments, but we interpret his brief to challenge the trial court's ruling denying Otter's motion to suppress the statements Otter made on Sergeant Alonzo's body camera and granting the motion in part as to statements Otter made on Ranger Pauska's body camera.[3] Otter did not request an attorney in the recording made on Officer Wall's body camera; Otter, however, did request an

---

[2] At trial, Otter's trial attorney "renew[ed] his objections" from the pretrial hearing when the State offered the recording made on Sergeant Alonzo's body camera as an exhibit. The State did not offer the recording made on Ranger Pauska's body camera at trial.

[3] The trial court did not admit the recording made on Ranger Pauska's body camera, and Otter does not contest the trial court's ruling as to that recording.

attorney on the recording made on Sergeant Alonzo's body camera. However, Otter's argument on appeal, in large part, conflates the statements Otter made on Officer Wall's body camera with the statements Otter made on Sergeant Alonzo's body camera. In his sole issue, Otter contends:

> At the Motion to Suppress hearing, the Court denied [Otter]'s request to suppress statements he made to Officer Wall while still at the scene as well as to Ranger Pauska at the police station. However, at trial the state ultimately did not use the Pauska interview and only admitted the Wall video. [Otter] was in police custody during the Wall video and early in the video he requested an attorney, yet Wall continued to question without an attorney present. [Otter] renewed his objections to Sergeant Alonzo's body cam video at trial.

Having determined Otter has waived error as to the admission of Officer Wall's body-camera recording, Otter is prohibited from asserting the trial court erred in admitting Otter's statements on Officer Wall's body-camera recording—to the extent he does so—for the first time on appeal. *See* TEX. R. APP. P. 33.1 (to preserve error for appellate review a party must make a complaint to the trial court, state the grounds with specificity unless the grounds are apparent, comply with rules of evidence or procedure, and obtain a ruling from the trial court or object to the trial court's refusal to rule).

We consider whether the trial court erred by denying Otter's motion to suppress the statements he made on Sergeant Alonzo's body camera.

## STANDARD OF REVIEW

"We review a trial court's denial of a motion to suppress for an abuse of discretion and apply a bifurcated standard of review, affording almost complete deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor." *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016). However, we review *de novo* the trial court's application of the law to the facts. *Id.* "The decision as to whether custodial questioning constitutes 'interrogation' under *Miranda* is a mixed question of law and fact, and we defer to the trial court's fact findings that turn on an evaluation of

credibility and demeanor." *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012). "If credibility and demeanor are not necessary to the resolution of an issue, whether a set of historical facts constitutes custodial interrogation under the Fifth Amendment is subject to *de novo* review because that is an issue of law: it requires application of legal principles to a specific set of facts." *Id.* We view the record in the light most favorable to the trial court's determination and reverse judgment if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). We will uphold the judgment if it is correct on some theory of law applicable to the case. *Id.*

## DISCUSSION

Otter argues that his statements made to Sergeant Alonzo were taken in violation of Otter's *Miranda* rights because he was in custody when Sergeant Alonzo questioned Otter and he was never given *Miranda* warnings.

Under the Fifth Amendment to the United States Constitution, statements a suspect makes during a custodial interrogation are inadmissible unless certain warnings were given to the suspect before he makes those statements. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966); *see* U.S. CONST. amend. V. When seeking the suppression of unwarned statements, the defendant bears the burden to prove a statement was the product of a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). A suspect is in "custody" for *Miranda* purposes if a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest under the circumstances of the interrogation. *Herrera*, 241 S.W.3d at 525. This "reasonable person" standard presupposes an innocent person. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). "The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances." *Dowthitt*, 931 S.W.2d at 255.

The Texas Court of Criminal Appeals has identified four general situations that may constitute custody: (1) when the suspect is physically deprived of his freedom in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave. *Dowthitt*, 931 S.W.2d at 255. "The first three situations require that the restriction on a suspect's freedom of movement must reach 'the degree associated with an arrest' instead of an investigative detention." *State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013) (quoting *Dowthitt*, 931 S.W.2d at 255). Although the fourth situation requires that an officer's knowledge of probable cause be manifested to the suspect, custody is not established unless that manifestation of probable cause combined with other circumstances, such as duration or factors relating to the exercise of police control over the suspect, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

A person held in investigative detention, however, is not in "custody." *Dowthitt*, 931 S.W.2d at 255. "During an investigatory detention, officers are permitted to use reasonably necessary force to maintain the status quo, effectuate an investigation, or protect the safety of individuals at the scene." *State v. Whittington*, 401 S.W.3d 263, 273 (Tex. App.—San Antonio 2013, no pet.). Investigative detentions must last no longer than necessary to effectuate the purpose of the detention. *Davis v. State*, 947 S.W.2d 240, 244–45 (Tex. Crim. App. 1997). A noncustodial detention may escalate into custodial detention. *Dowthitt*, 931 S.W.2d at 255.

Otter argues he was under arrest when he made the statements recorded on Sergeant Alonzo's body camera. We first assess custody as to the initial twelve minutes Otter was detained by Sergeant Alonzo. We then consider the remainder of Otter's detention at the scene. The first

twelve minutes that we consider includes the time up to, but not including, Sergeant Alonzo's statement to Otter that the police needed Otter's cooperation and Otter's subsequent request for an attorney.[4]

We determine that Otter was held in investigative detention during the first twelve minutes he was detained by Sergeant Alonzo because Otter's temporary restriction did not rise to the degree associated with an arrest and would not lead a reasonable person to believe he was under arrest. *See Dowthitt*, 931 S.W.2d at 254–55. During the first twelve minutes, Sergeant Alonzo ascertained the victim's and Otter's identities and residences and the number of weapons on the scene. One weapon, a 9-millimeter gun, was unaccounted for and presented a risk to officer safety until found. Sergeant Alonzo patted Otter down and asked several times whether Otter was in the bedroom during the shooting. Sergeant Alonzo's questions and conduct during the first twelve minutes he was on the scene were necessary to effectuate an investigation into a reported suicide and to protect officer safety.

Otter relies on *Dowthitt* to argue his statements were a product of a custodial interrogation. In *Dowthitt*, the Texas Court of Criminal Appeals concluded that the appellant's custody began about twelve hours into his questioning, after the appellant made a crucial admission stating that he had been present during the murders that the police were investigating. *Id.* at 257.[5] Otter's detention by Sergeant Alonzo during the first twelve minutes is less like *Dowthitt* and more like

---

[4] Officer Wall, the first responder, was on the scene approximately three minutes before Sergeant Alonzo arrived. In total, the first period we consider is the initial fifteen minutes that any peace officer was on the scene

[5] Otter argues that Officer Wall's statement that he "had a bad feeling about this one," made after Officer Wall directed Otter to Sergeant Alonzo, and Sergeant Alonzo's testimony at the motion to suppress hearing that Otter was a "focal point" would lead a reasonable person to believe he was under arrest. However, having a bad feeling and focusing on an individual do not establish probable cause. *See Lunde v. State*, 736 S.W.2d 665, 667 (Tex. Crim. App. 1987) ("An investigating officer's hunch, suspicion or good faith perception are not sufficient, alone, to constitute probable cause for an arrest."). Moreover, only the circumstance that Otter was a "focal point" was arguably manifested to Otter. Accordingly, a reasonable person would not consider himself under arrest under the circumstances Otter identified. *See Dowthitt*, 931 S.W.2d at 255; *State v. Stevenson*, 958 S.W.2d 824, 829 (Tex. Crim. App. 1997) ("[E]ven if appellee had become the focus of a DWI investigation, that fact alone would not give rise to custody.").

numerous cases determining detentions under an hour for investigatory purposes did not amount to arrests. *See*, *e.g.*, *Castro v. State*, 373 S.W.3d 159, 165–66 (Tex. App.—San Antonio 2012, no pet.) (concluding that a twenty-five to forty-five minute detention was not unreasonable when officers had to find and detain a second suspect and transport both suspects for an on-site identification); *Belcher v. State*, 244 S.W.3d 531, 542 (Tex. App.—Fort Worth 2007, no pet.) (concluding that a twelve-minute initial investigation followed by a twenty-seven minute period of waiting for an officer trained in DWI investigation was not unreasonable because the wait served legitimate law-enforcement purposes); *see also United States v. Sharpe*, 470 U.S. 675, 687–88 (1985) (rejecting the notion that a twenty-minute detention is unreasonable when the investigation was done in "a diligent and reasonable manner"). We hold the trial court did not err by denying the motion to suppress as to Otter's statements made to Sergeant Alonzo during Sergeant Alonzo's first twelve minutes on the scene.

With respect to Otter's statements made to Sergeant Alonzo after his first twelve minutes on the scene, we assume, without deciding, that the trial court erred by failing to suppress Otter's statements; however, we determine any error to be harmless.

Because our analysis concerns evidentiary error, we specifically consider whether the record contains other properly admitted evidence that supports the material fact to which the inadmissible evidence was directed. *See Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006). The trial court's error is harmless if there is no reasonable likelihood that the error materially affected the jury's deliberations. *See* TEX. R. APP. P. 44.2(a); *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

After viewing the record in a neutral light, we conclude that the error, if any, in admitting Otter's statements that he made after the first twelve minutes Sergeant Alonzo was on the scene did not prejudice the jurors' evaluation process and did not contribute to Otter's conviction. *See*

TEX. R. APP. P. 42.2(a). The medical examiner testified at trial that she concluded Winters was shot by another person based on the autopsy evaluation of Winters. Otter's friend Arkwright testified that Otter stated, a day or two after the shooting, that he shot Winters. Sergeant McGuire testified that Otter stated, two days after the shooting, that he believed the gun went off during a struggle and, in his mind, it was a case of self-defense.

The State argued at trial that Otter's statements to Officer Wall and Sergeant Alonzo at the scene discredited Otter because he first claimed Winters committed suicide and he was not in the room but days later he admitted to Arkwright and Sergeant McGuire that he shot Winters. Officer Wall and Sergeant Alonzo testified that they were dispatched to respond to a reported suicide. Officer Wall testified, and his body-camera recording showed, that Otter stated to Officer Wall that Otter did not know what happened, he gave a gun to Winters, and he went to check his daughter. Sergeant Alonzo testified, and his body-camera recording showed, that Otter stated to Sergeant Alonzo that Otter did not know what happened, he gave a gun to Winters, he went to the hallway to talk to his daughter, he heard a gunshot, he returned to the bedroom, and he saw Winters lying on the floor with blood. Thus, by the twelve-minute mark as recorded on Sergeant Alonzo's body camera, Otter had fully stated his alternative version of events that the State used at trial to discredit his truthfulness. No statement by Otter after the twelve-minute mark materially changed or added to Otter's prior statements.

Based on a review of the entire record, we cannot conclude that any alleged error from admission of Otter's statements after the twelve-minute mark on the recording from Sergeant Alonzo's body camera contributed to Otter's conviction. *See* TEX. R. APP. P. 44.2(a).[6]

---

[6] We do not reach Otter's argument that Sergeant Alonzo's questioning should have ceased immediately once Otter requested an attorney because Otter requested an attorney only after the twelve-minute mark on Sergeant Alonzo's body-camera recording. As just discussed, even if we assume error after the twelve-minute mark, any error was harmless.

**CONCLUSION**

We conclude the trial court did not err in admitting Otter's statements made while under an investigative detention during the first twelve minutes Sergeant Alonzo was on the scene. We further conclude that any potential error in admitting Otter's statements after the first twelve minutes was harmless. Otter's sole issue is overruled. We affirm the trial court's judgment.

Rebeca C. Martinez, Justice

DO NOT PUBLISH